I represent the appellate in this matter, Robert White. I represented him at trial in April of 2016. I want to start my argument on item number three, that the district court committed reversible error when it denied the appellant's motion for judgment of acquittal at the close of the government's evidence related to evidence that was adduced at trial for possession of a firearm and possession of a firearm in furtherance of a drug trafficking crime. If we look at this case as a whole, I want to talk factually about a couple things and then I'll get straight into my argument, which is there was a car stop on February 3rd of 2013. No gun was found in that car stop. There was a car stop on March 8th, 2013. No gun found at that car stop. There were 12 controlled buys alleged by the government through confidential witnesses. There was no evidence adduced at trial from police witnesses or anybody else that a gun was ever used, seen, or witnessed during any of those controlled buys. Guns came up. There was also a car stop on June 6th of 2016, a third car stop where there was drugs present in the vehicle and also no gun present on that occasion. A gun in question in this case came about on June 6th, 2016 in a search of a home at 9008 East 85th Terrace in Raytown, Missouri. That location is not even close to the vicinity of any of these alleged controlled buys. The information at that time... Was the evidence which you concede the evidence was sufficient to indicate he controlled the residence and could be in constructive possessions of items contained in it? I think that's going to be the government's contention, Your Honor. However, I think the evidence is really the opposite of that. They're going to say that he had exclusive possession of that residence. The police witnesses in this case testified that they did spot checks on that house and they noted that there were other individuals, several individuals outside the residence. They noted an unknown black male exiting the residence on one occasion. They noted a female and a child exited the residence on another occasion. And the evidence within the residence where the gun was actually found was on top of a cabinet in the kitchen. The drugs that were found in this case were in a washer and dryer, a dryer actually, in a completely separate room. And the government's contention was basically that he exclusively somehow possessed this house. And the only evidence that there was no, there was never anything established by the government in any way whatsoever as to who owned the house. There was no rental agreement for the house. There were no utility bills in the house. There was mail to Mr. White. There was items of clothing that a detective testified to that would be consistent with Mr. White. But none of those clothing, none of those clothes were ever inventoried. We have no idea what size they were. That's a spot check in a closet to say those clothes belonged to him. There were also bicycles in the garage that would be consistent with that child that left the house. And for those reasons, I think it's just a huge leap to think that there was sufficient evidence to prove that somehow he exercised dominion and control over a gun that's in a kitchen in a house that there's no other proof that he was the exclusive owner or occupant of that house. Was there proof of any competing owner, occupant, renter? Was there any alternative proof? Not saying that you were required to put it on, but just saying does the record reflect some ambiguity about who might have been in control? The only thing is what I've already stated, which was that during surveillance, they noted an unknown black individual leaving the residence on one occasion. And by the way, there were only five reports related to surveillance of this resident. And in those reports, they acknowledged that a female and a child left the residence at one time. They also noted that other African Americans were outside the residence. Did they describe the duration of the observation periods? They did not. They did not. Did they describe how long the people were in the house, the other folks? They did not, not to my knowledge. And the troubling part about this is that especially when we get to the dominion of control, obviously no one ever tested that firearm for any DNA, fingerprints, anything like that, so we have no idea if he ever actually touched the gun or knew it was there. The gun being where it was on top of a shelf, his bedroom was a separate bedroom. There was another bedroom in the house. There was a bathroom. And part of the government's argument is that this general idea that guns are there to protect your drugs or your drug trade. And I'd say the opposite. When you've got a firearm that's above a kitchen cabinet in your kitchen, I would think the gun would be right next to you in your bedroom, somewhere where you would have some kind of access to it. There wasn't testimony as to the height of Mr. White, but clearly he would have had to have gotten on a chair, gotten up on the counter to get the gun. I'm sure you're familiar with Eighth Circuit precedent on this particular issue, and the proximity has not necessarily been very, certainly not necessarily at arm's reach or didn't have to be a very close proximity. And here, in addition, there was some paraphernalia, I guess, that was near the firearm. So I guess your main argument here is that there's just no control. It's not so much that there couldn't be some connection between the firearm and drugs if there's drug paraphernalia and drugs actually in the residence. Your argument is the government just didn't make the case for constructive possession. That is correct. To follow up on the drug trafficking part of it, wasn't the gun found right next to a scale with white powdery residue? The Chief mentioned paraphernalia, but it was even more than that. There was a scale next to the gun. Was there also a white powdery substance in the vicinity? To be honest with you, Your Honor, I'm not sure. Okay, thank you. The next argument with that is that for the next level, probably in terms of Mr. White's case against the 60-month executive sentence for the furtherance, using that firearm in furtherance of a drug trafficking crime, the Sanchez-Garcia case that I've cited talks about possession that furthered, advanced, or helped forward the drug crime. And that's why I go back to the facts of this case. If we take it at its face, there's 12 controlled buys, there's no mention of a gun. There's three car stops, no mention of a gun. And then we have a gun that's in a house and back to above a cabinet, above the field. In the general argument, I think by the government, is that because of the proximity to a scale above the thing, that coupled with the general dangerousness of firearms and drug traffickers, somehow he used it in furtherance of these drug trafficking crimes that he's charged. And I think that the argument for my client would be is that that argument, the evidence simply isn't sufficient to support that somehow that firearm above that kitchen cabinet, not witnessed anywhere else, not seen anywhere else, the possession is one thing, but somehow in furtherance of the drug trafficking crime, I would argue that the district court erred in not denying my judgment to put along both of those counts, but even more specifically, in furtherance of a drug trafficking crime. The second issue I want to talk about is the district court's denial or overruling our objection to the admission of evidence during an illegal search of a vehicle Mr. White was in on March 8th of 2013. First, I'd like to point out that on that date and time, the court relied on two things in their ruling in denying the motion to suppress that. One, there was no expectation of privacy in a rental vehicle, and I would concede at the time I believe of that suppression hearing, and I didn't try that suppression hearing. The public defender's office did at that time, but at that time I think the law was established in the A circuit that there was no expectation of privacy in a rental vehicle. I believe that that law has been changed by now a Supreme Court case in Byrd, which furthers the argument that it's not about authorization. The question is lawful possession of the vehicle. I think that case shifts the burden to the government to show that somehow he was in unlawful possession of that vehicle, either that he obtained it fraudulently, illegally, or by other means. I would argue that that case would . . . There was various splits in the circuits, and that Supreme Court case I think solidifies the issue that it's not about whether you had authority to be in the car. It's whether you were in lawful possession, almost going to a land or home possession argument. You possess it. You own it. You're in it. You have authority to . . . But isn't the general rule that the defendant who's challenging the search has the ultimate burden of showing that he has standing, he or she has standing to challenge the search? Yes, and I think by being in the vehicle and there being no other means of him being in that vehicle illegally, that he was lawfully . . . Well, you said that the government needs to come forward with something else, and I was trying to challenge that. I don't know that the government had to come forward with anything else necessarily because it was your burden to prove it. But even more fundamentally on the Byrd case, my understanding of the Byrd case is that it essentially held that somebody who is not named on a rental agreement but has the consent of the named renter could still have a reasonable expectation of privacy in the vehicle such that the search would . . . that they would have standing to challenge the search. I don't know if it goes as far as you suggest. What's your best argument or best passage in the case that it goes further? Again, without re-reviewing the case, Your Honor, I probably can't answer that question. My argument would be, in my reading of the case, I think my argument would be simply that if he was lawfully possessing the vehicle and there was no proof otherwise, that he was in lawful possession of that vehicle. Okay. And if the court does go past the standing . . . What does it mean when it says he had a blank rental agreement? What's a blank rental agreement? You know what, I don't know what that means myself. I'm assuming that it's a rental agreement, like a standard rental agreement, but it wasn't filled in with names or whose it was. That would be my assumption. Okay. So how did you meet your burden of proof then of showing standing if, in fact, it didn't contain his name, it didn't contain anything?  wasn't otherwise fraudulently . . . See, I think you're shifting the burden of proof to the government at that point because I think that there's nothing to say that he was lawfully in possession. We just don't know. We have no idea whether he was in lawful possession because there's not a rental agreement with his name on it. There's not a signed note from whoever has the car. I mean, you've got nothing here, I think. Maybe I'm wrong. And again, I think the Byrd case does say that if you're in possession of the vehicle, that in and of itself is enough. That would be my . . . All right. Fair enough. But Byrd specifically seems to say that it doesn't cover the possibility of protecting thieves who've stolen a car. So there would seem to be some obligation to indicate that one has lawful possession. Well, and my point being is not to say it shifts the burden back to the government on the ultimate issue, but if there's no proof that that car was stolen, fraudulently obtained, or otherwise, then my argument is that he is now in lawful possession of that vehicle just by being in it, driving it, and there being no other issue with him being in that vehicle lawfully. Did he have the keys? I assume he did because he was driving it, but I don't know. I do know that . . . I mean, car thieves have ways to drive cars away without having the keys, so I wonder if he had the keys to support your argument that . . . And to be honest, I don't know the answer from the record. I think the record would be that he was driving the vehicle for a period of time, he turned into one location, then went to another location, ultimately taken out. And he didn't put on any evidence at the hearing about how he got the car, right? And as far as the inventory search, if we can go to the second argument with the court, because the court never addressed the issue of whether there was any probable cause to further search the vehicle. I'd simply argue on that that it was a pretextual search. Why isn't probable cause the simplest way to resolve this? Didn't they find him with . . . Didn't they have intelligence that he was stealing drugs and found him with a big amount of cash? And that is true, but the court never got to that decision when they made their decision. But the government says we should affirm or could affirm on that ground. What's your thought on whether there was probable cause? Well, at that time, they had information from a confidential witness who said he might have drugs. They pull him over, he's got cash in the vehicle. That was it at that time. And that was 2013. That was three years before any of these controlled buys. Well, I mean, confidential informants can create probable cause sometimes. I guess we'd have to look exactly what they had from the CIs. And my argument again would be is that at that time they should have gotten him. Well, you don't need a warrant for a car, right? I think it would just be a probable cause question. Your time has expired. Thank you. Mr. Hurst? May it please the court? Ben Hurst for the United States. I'd like to start with the Fourth Amendment issue, the second issue that counsel was discussing. I think that this court's case in Bettis, which we sent out a 20HA about three weeks ago, reaffirms that post-bird the defendant has a burden to show a reasonable expectation of privacy in a rental car. And we think that the district court here didn't make a plan error in concluding that that burden hadn't been met here. And I think that's the right result for a couple of reasons. Here we have, unlike the cases in Bird where there was some evidence of the second order permission, so the rental car company didn't give permission for the defendant in that case to be driving the car, that's the holding of Bird, that they don't need it. But in that case, there was permission from the person who was authorized to drive the car. The same thing is true in Bettis in this court's recent case. But here we have something totally different. Here we have a person who is merely in possession of the car. Mere possession of the car can't be enough to show a reasonable expectation of privacy because there's no distinction that the court says that cuts too broad a gauge. There's no distinction between that person and a person who got the car by theft or the suggestion in Bird maybe that by fraud upon the rental company. So that merely having a rental agreement in the car isn't enough to push that inference beyond mere possession to a place where we can make a claim about reasonable expectation of privacy because the rental agreement here doesn't establish the permission from the rental company who we know owns the car. Does the record explain what a blank rental agreement is? Your Honor, I pulled a copy of the transcript from the trial. At the suppression hearing, what we have is the underlying police report that was introduced in evidence that talks about the blank rental agreement, and that's all it says. At trial, there's a little bit more. On page 87, the officers ask, do you have any idea whose car was in that day? It was a rental question. Do you have any idea who rented that car? He says, no. Do you have any, did anyone investigate anything related to who rented the car? He says, I did not. And then he says, I do recall the rental agreement was blank. There was no name or anything on it. So that's where I can direct the court to for more information about what the rental agreement said. What we know is it's not the kind of rental agreement that would establish a contractual obligation and permission from the rental company, the ultimate owner of the car, and to the defendant. And I would say further, to the extent that the court is willing to accept an inference from the blank rental agreement, I think to that extent, the Second Circuit's case in Lyle still has some force, even though it's been distinguished by this court in Bettis, because in Bettis there was this permission, and the court said, well, just unlawfully driving the car doesn't negate your reasonable expectation of privacy in the car. But here, the lack of the driver's license indicates that what Lyle is talking about, that the fact that a rental company isn't going to rent a car to somebody who's been caught driving, well, his license was suspended six or seven times to the extent that this defendant has, I think defeats any remaining inference that can be drawn from the blank rental agreement. So following that, what we have is just the defendant in possession of the vehicle and a failure of proof on the defendant's part to show that his expectation of privacy in the car was reasonable, that he had lawful possession of it. And for that reason, I think that the court, and I'd make one additional point about the burden. There's actually two different reasons the defendant has a burden here. First, the defendant has a burden because that's the law in the Fourth Amendment suppression issue. But second, because the defendant didn't object to the factual findings in the R&R, the defendant has a burden under plain error as well. So there's two different reasons here why the defendant needed to come forward with evidence and didn't do so. We'd say there's no plain error, and the court can affirm on that reason alone. I will spend a little bit of time talking about the tow policy. I think that the—it wasn't fully discussed here, but I think there's an explanation about why the tow policy was complied with here that I just want to spend two or three minutes talking about a distinction that can be drawn between the situation that the defendant is suggesting in his brief about implied consent, that everyone in the public can pull on to private property, and that means that there was implied consent and we had to show some further removal of consent or taking away of consent or complaint. And the government would suggest that instead here, the difference between that scenario that the defendant is describing and what happened here is that the only reason the defendant was on the property to begin with was because that's where he decided to drive when the officers turned on their lights and pulled him over. So it's not a situation where he had some prior business relationship with the property owners or he had purchased parking there or he had some personal relationship that the parking was—permission was implied. It was purely a situation where he just drove there in order—solely at the order of police when they stopped him. And I think that that implied consent argument that the defendant makes in his brief doesn't go as far as to cover this situation. For that reason, we think that the officer's decision to tow the vehicle was based on a lack of consent or an implied non-consent, if you will, plus the Evans case that we cited about handing the ticket to the defendant. Lastly, on the Fourth Amendment issue, I would spend just a little bit of time—we did raise that issue about probable cause. We think there's ample probable cause here. We think that the addition of the confidential informant informing the officer, the detective, that a person named Bebop was dealing crack cocaine, the officer finds out that Bebop is the defendant in this case, and then the confidential informant also tells the officer, well, he's driving around in a white Dodge Avenger and it has these kind of plates on it, and that's what the officer corroborates that testimony or that statement from the confidential informant by his observation of the defendant, who he's identified as Bebop, getting into a car meeting description of what the confidential informant told him he'd be driving. So we think that shows that piece of the evidence added together with the arresting officer, the officer who pulled him over, testified that he knew that the defendant had previously been arrested with a large amount of crack cocaine, and add that together with the lawful and unchallenged search incident to arrest him, it would yield almost $2,000 in cash, we think shows probable cause to believe there'd be evidence of drug distribution in the rental car. So we think that the court can affirm on that alternate basis, even though the district court didn't reach it. Unless the court has additional questions about the Fourth Amendment, I'll spend a couple of minutes talking about the sufficiency of the evidence. I see none. So the, I think that maybe you're focusing on the issue a little bit. I don't think there's an issue with the furtherance of a drug trafficking crime. We have the, I'd urge the court to review the video if there's a question about this, but what the kitchen is here, they find the gun, which is loaded next to the scale with the white powdery residue on it, and in the next adjacent room, immediately on the wall after that, there's the washer and the dryer where they find all the cocaine. And the adjacent room is enough to show furtherance of a drug trafficking crime. Was the white powdery residue ever tested or swabbed or anything to figure out whether it was an illicit drug? Not to my knowledge, Your Honor. I don't think so. Could have been baking soda, you mean, in the kitchen? That could have been, Your Honor. There was testimony by an expert at trial about the use of guns and drugs together and why it is important for drug dealers who can't call the police to have guns available to protect their stash. We know, in fact, that there was cocaine in the room next door. Summarize the government's establishment of control of the premises. The defendant, when he was arrested, gave that address as his residence. So with respect to control, that's good enough. And I think if you add that together with the corroborating fact of his mail was there, he was observed at that location. In fact, if the court is interested, the time that another black male was seen entering the house, that testimony is on page 333. And the reason that the officers were watching the defendant's house at that time was because at the same time they were making a call to the defendant to order crack cocaine, and they observed the defendant leaving his house at the same time. So the idea that the defendant was never in a place where he could further his drug trafficking crime with that weapon because he never had guns at any of the points where they found him or did a controlled buy, I think is somewhat belied by the fact that at the time that they saw the other person there was the time that they saw the defendant leaving to perform a drug buy from that location. Is it true that some of his mail was found there? That's true, Your Honor. Did the mail, was it addressed to that address? Yes, Your Honor. And to further the Chief's point, is there any evidence as to how long the other visitors were there? And the reason why I ask that is if somebody's there for 45 minutes or half an hour or even less, it could be a drug transaction. If somebody's spending the night, then that changes the calculus in terms of possession, I think, exclusive possession over the premises. I agree with that, Your Honor. I would point the court to, there's no direct evidence to the court's point about whether they were staying the night there. There was, of course, no mail found in any other person's name. There were no women and children's clothes there. So those are counsel against that conclusion. At the time that the other person, the other mail was seen there, it was a situation where that mail was coming in and out of the residence and there were other people standing outside. And shortly thereafter, the defendant left to make this drug run. I guess one further point I would make about that is that this is a question of where all of the reasonable inferences from the evidence are going to be taken in the government's favor in support of the verdict. And the question for this court is, is there any reasonable jury, given all those inferences, that could find the, that would not have found the defendant guilty? And we would suggest that the evidence here was sufficient both to show possession of the firearm in the house and to show that it further drug trafficking crime. I see I've got a couple of minutes left. I'll move on, just have one or two things to say about the confrontation clause. But if there's no additional questions on the sufficiency. The only thing I would say about the confrontation clause is to point the court to the Spencer case. Spencer case is very closely aligned with the facts here. Same situation where a confidential informant was making calls on the, from directing, directed by an officer to the defendant to set up drug transactions. And the court said that that didn't violate the confrontation clause because those calls on the part of the defendant weren't confrontational because they were admissions of a party opponent. And as for the other discussion, it was necessary to explain what was going on when the defendant was saying. And that same thing is, is present here. And we don't think there's any reason to distinguish Spencer in this case. Unless there are additional questions for me, government would ask the court to affirm. Thank you. Thank you, Mr. Hurst. Mr. O'Connor, you exhausted your initial argument time. Was there something that was heard in the government's statement that you feel the court absolutely needs to hear for a fair review of your appeal? All right. Court notes that you're serving as an appointed counsel on the Criminal Justice Act and we express our gratitude for your willingness to participate on the panels. All right.